Before we start, I just want to give the lawyers a heads up on the American Society case. We are very simple people. And so we're going to ask you to structure the argument with the four factors. If you could walk us through the four factors, how they support your position, that would be most helpful. So whenever you're ready, we'll call 24-2965, American Society v. UPCODES. Mr. Fee, how are you, sir? Doing great, Your Honor. How are you? Kevin Fee, on behalf of American Society for Testing and Materials, or ASTM International. I'd like to reserve two minutes for rebuttal. At Your Honor's suggestion, I'll jump right in on the four factors, just because I know our time is limited here. The first factor, I think, is one of the most important issues we need to deal with here today. And as Your Honors all know, that really addresses two separate issues. First, whether or not the use by the defendant was commercial or non-commercial. And second, whether or not the use was transformative. So why don't we start first with the question of whether or not the use was commercial or not. The important point that we take away on the first factor in the commercial test is that you need to assess commerciality on a use-by-use basis. And it's important to bear in mind here that ASTM alleges that there are two separate activities that the defendant is engaged in that constitute copyright infringement. First of all, they have a paid tier subscription model where they sell access to the standards and then allow you to make edits and view and search the standards. The district court never addressed the paid tier when it conducted its assessment of commerciality. How big a difference is it that there's a commercial component here, as opposed to the recent D.C. Circuit opinion that was a non-profit, so to speak? I think that's a very big difference for lots of reasons, one of which, of course, it controls one half of the first factor analysis. And as we get to factor four, it also has a big impact on the effect on the marketplace as well. So it is, I think, a key distinction. And even the D.C. Circuit makes the point that that's an important distinction and that they may reach a different result if it was a circumstance where a commercial entity was selling access to the standards. But even the free tier that UpCodes uses is also a commercial use. As the district court in the NFPA case explained, they use our standards as a funnel to identify potential customers. They are not making these standards available for free to anybody who shows up on their website. They hide them behind a password-protected account. Now, you can join for free, but you have to ask yourself, if this was really about providing access to the public, why would they be hiding it behind a password? Yes. Sure, I mean, that's actually, I think, a really important part of understanding the importance of this case. The way that ASTM funds its operations is primarily through the sale and licensing of its standards. So it doesn't have, you know, to the persons who use those standards, which I think is also a very important point, Your Honor, but let me first answer how they go about funding their business. There were lots of ways that standards could be funded, right? I mean, Congress could just pay to have those funded, but that comes with the problems of getting funding every year. We're about to have a government shutdown potentially right now, right? There's a second way you could fund these standards is by basically requiring the participants who are involved in creating these standards to pay to subsidize the creation of these standards. But the problem with that is then you leave out all the sort of the small businesses, the public interest groups that may not be able to afford to pay to be a member in these organizations. So what ASTM and many standards development organizations have decided to do is, rather than charge people to participate in the development of the standards process, they've elected to charge a small fee to persons who use these standards to recover the cost necessary to create these in the future. And I do want to focus, again, it's a fee. The people who pay these fees are people who are using these standards. And let's talk a minute about what these standards are. There's so many different standards here. Are the fees assessed like a membership thing in ATSM or are some only interested in building standards or pipes? There's lots of ways you could get access to these standards. They generally charge if you're buying a standard, a single standard, on a per page. They basically have a page. You know, if it's five pages, it's $50, and if it's seven pages, it's $75. Who are the typical consumers? So the typical consumers are professionals in this space, which is the point I've been trying to get to. So if you look at the standards that are issued in this case, they talk about how to go about, for example, testing the tensile strength of a carbon steel pipe or something like that or beam. You cannot do that at your home. Like this isn't mom or pop trying to figure out if their HVAC system complies with an ASTM standard. To do that tensile strength testing, the record shows, you need to spend $10,000 to even get that equipment. So it's not even architects who are doing this testing. It is individuals or companies that do testing as a business who are typically using these types of standards and the ones who are paying for them. So I think if that answered all your questions with respect to the commerciality question, I do want to move on because I know we have limited time. Sir, with my – say I'm only interested in a very narrow set of standards. Yes. So the lead pipe standard. How do I access that for free or can I? It depends who you are. The record is clear that if you're unable to access the standards because you're unable to pay for them, that ASTM will make the standards available to individuals in that circumstance for free. How do I do that? Just contact ASTM and ask. Okay. There's other ways you could become – get access to these things. You could pay on an individual basis for a standard. The record's clear. It's like $70 to $120. But almost nobody does that, truthfully, because you could also get a subscription to their ASTM Compass subscription service that allows you to access them. And if you become a – I'm sorry. Is them – all of you, like 10,000 members? You could buy different packages depending on what you're interested in. You could also – if you become a member, you have free access to one of the books of standards as well. Who gets this for free, like a small contractor? No, not – I don't even think small contractors can pay $100 to get access to these things. It really would be individuals who, for whatever reason, want to know whether or not their carbon fiber is up to measure and can't afford to pay $100. But who is that? I think that's really the problem here. Exactly, Your Honor. I mean, you're going to hear, I'm sure, in the next presentation, a lot about the need for access. There's never been a problem with accessing these standards. The record has zero evidence that any person was ever unable to get access to these when they needed them. And that's not just true in this case. I know you're all aware. There are many other cases involving these issues. And no plaintiff has ever come forward with evidence that somebody couldn't identify and access the standards when they needed them. Before you go, Your Honor, what is the purpose with that law? Look, I think that's a complicated question. But I think the best source for the answer to that question is the Warhol decision. And Warhol makes clear two things with respect to transformativeness. First, if you want to be transformative, you can't be a substitute for the original. There is zero debate here about whether or not the defendant's works are substitutes for ASTMs. The district court even found as much, saying that they were the effective substitute for the ASTM standards. The other thing I think is important that we learn with respect to transformativeness and Warhol is Warhol also makes clear that there's a tension between allowing fair use for transformative works and the idea of owning the rights to derivative works. And the way that the Supreme Court made clear you balance those two considerations is it says in order for a work to be transformative, the defendants must do something more than is required to be a derivative work. There's, again, no dispute here that the defendants are not doing anything beyond what's required to be a derivative work. In fact, there is a derivative work that ASTM sells called ASTM Standards and Building Codes. That is exactly what the defendants are offering here. Yes, they make no alterations whatsoever, no commentary, no criticism. So they are literally adding nothing to our standards, just reproducing them in their entirety. They're only reproducing the ones that have been incorporated by reference in laws, right? Well, in this case, there is sort of a question about what you mean when you say incorporated by reference in the law. There's no indication that any governmental agency has directly referenced any of these standards. They wouldn't have to reference it. I can incorporate something in the law and still not have a governmental agency reference it. That is true, Yar. What happened here is, for example, Pennsylvania, we've used a lot in this case. The Pennsylvania legislature has adopted the International Building Code, which is written by the International Code Council. That publication references many standards from ASTM and many other organizations. And this is really the first case that has addressed whether or not you should treat those sort of, you might call them indirect incorporation by reference, identical to regular incorporation by reference by a federal agency or state government. Sorry. No, I think the cases are clear that you need to balance both the question of whether or not the use is transformative and whether or not it's commercial. Here, I think, for the reasons I've explained, it's pretty clear both that these uses are commercial. I mean, they literally charge for access to our standards. And that their works are not transformative. Yeah, I think that is our position. And let me explain briefly why. The Supreme Court, again, in Warhol, made clear that the central question for Factor I is whether or not the work supplants, the copy supplants the original such that it's a substitute. The district court made a factual finding.  That uncoded copies were effective substitutes of ASTM's copies. And if there's sort of a balancing of two factors, and it's clear that the defendant's use is going to be substitutional, then the first factor should weigh in favor of ASTM. You know, even the Supreme Court described substitution as the copyrights bet war. That is really what this is all about. No. Then also, this is the fourth factor. Yeah, I was actually going to just move to that. I'm happy to talk about Factors II and III, but I'm very short on time here. And I think the fourth factor is the most important. Yeah, we'll give you the time you need. Why don't you go ahead and go to Number II. Okay. So, Factor II addresses the nature of the copyrighted work. And I think where the district court and, frankly, the ASTM DC Circuit decision went astray here is, the factor is the nature of the copyrighted work. The copyrighted work is ASTM's standard. What happened after the standard was created is not part of Factor II. Factor II focuses on the nature of the work. Now, admittedly, the nature of these works are factual. No. So that, you know, might be one factor sort of leaning against us. Of course, if this were a movie or a fictional work, that would be a feather in the cap of plaintiff that we don't have here. But that does not mean that this factor weighs against ASTM. You know, what Factor II is really focused on is the amount of creativity that is used to create these works and also whether or not there is a need to spark that creativity to have an incentive from the copyright law. And as we've explained, and really there's no evidence to the contrary, the way that these works get created is through the funding mechanism that we have in place where we charge licenses for access from the persons who are using the works. And it's also, I think, important to know in Factor II, the Supreme Court made clear that we shouldn't assume that works are not entitled to copyright protection when they're the most important, right? Copyright wants to incentivize the creation of really important works like these because they're so important. And as a result, Factor II also weighs in favor of no fair use here, although I will also make the footnote that the Supreme Court, and I think especially the Second Circuit and the Google Books case made clear, Factor II is virtually never a dispositive factor when we're dealing with fair use. If I understand you correctly, you're saying but for this funding mechanism, this material in its current form wouldn't exist. Right. I mean, that's exactly what the record shows. Would ASTM exist? Well, look, probably not in the same form that it is now, right? I mean, one of the things that they say, and the district court sort of suggested without citing any evidence, is that if we don't have copyright protection, ASTM is a nonprofit. They want to do good stuff. They'll figure it out. Well, you know, ASTM may love to continue to do the work it's doing without all this funding, but like in the real world, that's not how it works. You know, they have to buy computer systems. They have to rent, you know, facilities to have these meetings. They have 700-plus employees. You can't just fund all of that through goodwill and good intentions. We need to have a mechanism in place to fund these, and this is the mechanism that honestly Congress has decided on a long, long time ago. The Copyright Act doesn't say anything about accepting copyright protection for these works. The Supreme Court has made clear. I didn't hear the last part of what you said. It doesn't say anything about what? Accepting these types of works from copyright protection. The Supreme Court has made clear that you're entitled to copyright protection immediately upon creation and fixation in a tangible medium. That's also in the Warhol case. And even though that Copyright Act has a requirement for authorship, there's clear authorship here. That's not disputed. The district court found that ASTM had authorship and entitlement to a valid copyright. I'll touch briefly on the third factor. That factor here is, I think, pretty straightforward. That factor addresses how much of the work the defendant used. There's no dispute they used all of it. So that factor should weigh in favor of ASTM easily. I will briefly address what I'm sure my colleague is going to say and say that we need to copy all of it because it's necessary to achieve our purpose. And that sometimes is a valid argument if you have a transformative purpose. But factor three really depends on whether or not there's a transformative purpose in factor one. If you don't do any transformation and you copy the entirety of the work, then the case law is clear to factor three ways in favor of the copyright owner. Yeah, look, my contention is that I think it's exactly what the Supreme Court tells us. The Supreme Court tells us there's two questions on that. Are you substituting for the original? The answer is indisputably yes. The district court found as much. And it says if you want it to be transformative, you have to do more than is required for the work to be a derivative work. And there's no debate about that one either. They do nothing except reproduce our thing in the entirety. So Roehl, I think, makes abundantly clear that for two separate reasons, their copies cannot be transformative. Moving on quickly to factor four, then, the effect on the marketplace. This one is a bit of a puzzling one for me, because the district court found that it was, quote, plain to see how the defendant's copies were going to adversely impact the marketplace for the originals. The market for, well, that's a good question, Your Honor. There's two markets we really need to be concerned about. One is the market for the original works, which are the ASTM standards. But factor four also takes into account the market for derivative works. And, you know, I think in some ways the easiest one to think about here, again, is I referred to the publication ASTM has. Yeah, updated version is a perfect example of a derivative work. We also, ASTM sells a publication that's called ASTM Standards and Building Codes. That's one of our derivative works. What are they selling? ASTM Standards and Building Codes. So the district court found it was plain to understand why they would adversely impact the marketplace, but it nevertheless concluded that that factor was sort of 50-50, for lack of a better word, for a couple reasons that I want to just briefly touch on. First, I talked about one of them already. The district court sort of speculated slash hoped that even if ASTM didn't have this funding mechanism, somehow these standards would continue to be made. There's literally no evidence in the record to support that. She cites nothing to support that, and it's just not true. Right. Yes. Well, yeah, I mean, it's literally the name of the factor is the effect on the marketplace. She found it was plain to see that the defendant's use was going to affect the marketplace. So it's, I think, an inescapable conclusion in this circumstance that factor four weighs in favor of the defendant. I'm sorry, in favor of ASTM. How could it not affect the marketplace? Look, I mean, if you produce the entirety of the work in this circumstance, of course it does. And, you know, that's why the district court found it affected the marketplace. But it wasn't just this district court. The NFPA case involving UpCodes found it affected the marketplace. The FGI decision in UpCodes also found it affected the marketplace. Even the ICC court found it affected the marketplace. There can't be any serious dispute about if you give something away for free, then people are going to be less inclined to pay for it. The other thing that we've heard from UpCodes to try to swing the fourth factor in their favor is that the type of loss that we're suffering here or harm that we're suffering here is not cognizable under the Copyright Act because they say that, you know, there is no right to sell the law, for lack of a better word. I think it's a red herring when we're talking about fair use for sure. They obviously make some arguments about alternative grounds for affirmance where I think it may be more relevant, and I'm happy to discuss that if your honors are interested in doing that. But the question about what types of losses under the fourth factor are cognizable under the Copyright Act was addressed by the Supreme Court in the Pretty Woman case. And in that case, the Supreme Court made clear that it's true. If you copy a portion of a work, for example, to make a book review and you criticize it, yeah, like a parody is a good example of a type of harm that may be resulting from a copying that is not cognizable under the Copyright Act. But the Supreme Court explained the reason that harm is not cognizable is because the harm is not resulting from a substitution of the plaintiff's work by the defendant. So the key question about what types of harm or market impact are relevant for the purposes of fourth factor is whether or not the harm is arising from a substitution by the defendant for the plaintiff's use. How does the government edicts doctrine undermine or does it undermine that argument? I don't think it undermines that argument at all. I mean, first of all, the district court here concluded that we had a valid copyright. And, you know, they had the burden of proving that we did not. Other than the government edicts doctrine, they don't really make an argument on that front. But the government edicts doctrine doesn't apply here anyway. The Supreme Court made clear that the government edicts doctrine, it described it as a straightforward rule that relies on the identity of the author of the work. There's no dispute here that ASTM is the author of the work. You've got a copyright registration. It's entitled to a presumption of authorship as a result. And the defendants have never really suggested otherwise. So the government edicts doctrine, I think, not only did the NFPA court in the Upcoats case find the government edicts doctrine didn't apply because the Standards Development Organization was the author and it's a private entity, so did the FBI case as well. The Supreme Court in the Georgia case where they most recently discussed the government edicts doctrine made clear that the question when you're assessing whether or not the government edicts doctrine applies is who authored the work, not whether or not the work is binding as law. Justice Thomas, for example, pushed hard in his dissent for a rule that would have been different and said what matters is whether or not it's the law. The majority disagreed and said no, that's not what the last 150 years of precedent have told us about the government edicts doctrine. The government edicts doctrine is a clear rule that focuses on the identity of the author. And it even expressly says the government edicts doctrine does not apply to works written by private parties such as the players here. No, I think that's fair, Your Honor. I mean, I think there's a couple of guideposts that we can give you to help you figure out how to balance these. I mean, obviously, I think you understand our position is all four factors weigh against fair use. But if you reach a different conclusion, the Supreme Court has said repeatedly that the most important factor is the fourth factor, the effect on the marketplace. Even though it's not determinative. None of these are determinative. They've also taught us a holistic approach, right? Yes, that's also true. But if you're trying to figure out factors one and four favor no fair use and two and three favor fair use or however you divvy it up, I think the first thing you should focus on is factor four. The Supreme Court says that's the most important factor. And the other thing I would say is look again to the Warhol case. Warhol says that copyright's bette noire is substitution. There is no doubt, even the district court recognized, that the defendant's copies were effective substitutes for ours. Finding that that's fair use runs directly into the Supreme Court's conclusion that substitution is the bette noire of copyright. And for that reason, if you find it, like the district court did, that Upcode's copies are effective substitutes for the originals, you should find in favor of no fair use. Thank you. Thank you, Your Honors. Mr. Palmore. Yes, thank you, Your Honor. Joseph Palmore for Upcode's and Garrett and Scott Reynolds. And I do want to get to the factors. If I could just make a couple observations kind of that frame the issue. Because it's a foundational principle that citizens must have ready access to the laws that govern them, and that's the principle that's at stake here. ASTM is seeking an injunction barring Upcode's from publishing the law of the city of Philadelphia. The fact that the law is incorporated by reference doesn't matter. It's still the law, and anyone who violates it can be punished. Mr. Fee just told us that anybody that wants it can get it for free, even. One of their witnesses in a deposition said that. There is zero evidence in the record that that's ever happened. Why wouldn't that be? That's evidence, yeah. That's never happened. According to this record, there's no evidence that that's ever happened. There's nothing on their website that suggests that that is available. It's completely discretionary. There's no policy. But I think more fundamentally. A witness said that it's there. A witness said that they would do it if someone called. So that's evidence. Yes, absolutely, that is evidence, Your Honor. Well, Your Honor, I think the D.C. Circuit's ASTM case is important to point to. No, I know, Your Honor. Yes, but, of course, just because someone can go and ask someone for a copy of the law doesn't satisfy the interest of the public in having free and open access to the law. Sure. They are fundamentally different, and that goes to the different and transformative purpose. And so I would like to go right to that because that's factor one. That's the most important part of factor one. If you go to the UP Code's website, and there are screenshots in the record, what you see is the law, the law of jurisdiction. So you can click on Philadelphia, and you can get a copy of the building code, including all the provisions that are incorporated by reference. This is literally the only place in the world that you can go to get a copy of the Philadelphia building code. I'm looking at it. I just typed in Philadelphia building code. Yeah. I'm looking at it. Right. So the 2018 International Building Code came up. Right, because that's what's incorporated by reference. So if you look at the municipal code book of the City of Philadelphia, it says the building code of the City of Philadelphia is the 2018 International Building Code. It is incorporated by reference as if it's cut and paste. Right. And then you go to the International Building Code 2018, and it incorporates by reference and says treat as if cut and pasted the ASTM standards. But there's a critical point here about the versions, and this was critical for the D.C. Circuit in the ASTM case, and the district court here relied on it as well. And this goes to the fundamentally different and transformative function and purpose. UpCodes publishes only the incorporated versions. Those are typically old, superseded versions. Nine of the ten works at issue here have been superseded. There are new, more state-of-the-art ASTM standards that have come out since that time. UpCodes does not post any of those later updated standards. What good are the superseded building codes? I'm looking for a building code, and I find one that says that a piece of pipe has to have a certain resiliency and a certain level of stress. Yes. And then that's updated two years later, and the folks doing the research find, no, that's not sufficient. A pipe that will only withstand that amount of stress is subject to explosion, either by freezing during the winter or by too much water being pumped through it. We've got to update the code. So what good is the earlier code if it's been superseded? I think that question, you've put your finger on the fundamental difference here. So if I'm an industry professional and I want to know what is the latest state-of-the-art recommendation by ASTM, I'm going to want that updated current code. I'm not going to find that updated current standard. I'm not going to find that on the UpCodes website unless and until it's been incorporated by reference. What I'm looking for on the UpCodes website is the law of the city of Philadelphia. So if the city of Philadelphia has not incorporated that updated standard, it's not going to appear on the website because UpCodes is not conveying this information as standards. It's not conveying this information as the latest state-of-the-art. It is conveying this information as law. If it's amended, it gets amended on the UpCodes website. Again, because UpCodes' only interest here is to convey the law of the jurisdictions that it covers. Its interest is very different from— You're conveying the law with superseded codes? No, because—so there's a lag, right? So if you look at the building code of the city of Philadelphia, it says the 2018 international building code is incorporated as the building code of the city of Philadelphia. So that is the law. It's frozen in time. That code is the law. And even if there's a later building code, it's not kind of a dynamic incorporation, if you understand, Your Honor. So there may be a later version of the international building code that maybe incorporates by reference later versions of the ASTM standards. UpCodes won't publish that because that's not the law of the city of Philadelphia. If I'm a resident of the city of Philadelphia, if I'm doing a renovation in my house, or if I'm a resident who wants to see whether my landlord is living up to their legal obligations and I want to get the law of the jurisdiction that I live in, I need that 2018 version and the standards that are incorporated in it. I don't need the latest recommendations by ASTM. And UpCodes publishes only the incorporated standards. And that was critical to the D.C. Circuit's analysis of this exact same question involving ASTM. They said that this showed the transformative purpose, that these were different. My friend on the other side talked about the Warhol case there. The purpose there was exactly the same. It was, we need a portrait of Prince to illustrate a magazine article about Prince. The purpose here is very different because the statement by ASTM is, this is our latest recommendation on the best way to create steel pipe piles. The speech by UpCodes is, this is what the city of Philadelphia requires you to do with respect to steel pipe piles. And if you don't do it, you can be fined. Sure. We offer the law. So if you want to see, well, what is the building code of the city of Philadelphia, you can go on the UpCodes website and find it, including the incorporated standards. We don't charge for that. So there, yes. So anyone can sign up for free and access the law of all the covered jurisdictions, can cut and paste, can print, can do whatever they want with it. That's completely free. There is a premium tier that doesn't provide access to any additional information. It offers kind of advanced search functions, AI tools, things like that, and that there is a charge for. But the law is provided for free. And that was key to the D.C. Circuit's decision when it said, now to be sure, the publicresource.org was a nonprofit, but what was important to the D.C. Circuit was the law was offered for free. And UpCodes is doing the same thing. And for-profit commercial entities can make noncommercial use of material. Do you sell the information? Say someone logs on to get the information for free. To log on, they've got to give certain identifying information to UpCodes. Just an e-mail address, sure. And not a name? Maybe they may have to give a name, but there's no charge, Judge McKee. Name, last name, work e-mail, industry, organization size, phone number. It's completely free. Is that sold, that data? I'm not aware of anything in the record here suggesting that that's sold. And I haven't heard that argument on the other side. It is free access. It's absolutely free access to the material. All they charge for are these additional tools that are layered on top. And the free access is important. We talk about the Baltimore Ravens case in our papers. That's the Fourth Circuit case, Boucher, where the Ravens were using a logo. And the court concluded that it was fair use. They looked at it use by use. They said it was fair use when it was displayed in the lobby of the Ravens corporate headquarters because access to the lobby was open to the public. They didn't charge to go in there. So even the Ravens as a for-profit football team were making use of this. It was a noncommercial use. But at the end of the day, and I think my friend on the other side agreed, Google versus Oracle says that while commercial use can tip the scales in favor of fair use, the inverse is not necessarily true. And, of course, Google versus Oracle involved Google copying Oracle's code, and the court found that that was fair use. I mean, that's about the most commercial entity and the most commercial use you're going to find. And nonetheless, it was still fair use because it was transformative. There was no commentary. There was no parody. They took the code, but they put it to a different purpose, which was interfacing with smartphones instead of desktop computers. And what the court said was that even though it was wholesale copying, that by a commercial entity, that was a transformative purpose and use. And so, too, here with respect to the way that UpCodes is conveying the law of the city of Philadelphia, it's the only place you can find it. Is it transformative because it's free and because you provide the law? It's transformative because it's the law, right? This is an objective test. So it's a transformative use or purpose because it's being put to something completely different. It's not being provided to industry professionals who are looking for... Well, the difference is if I, and I think some of the amicus briefs on our side go into this, if I'm... Some of these cases have been about fire standards. If I'm a firefighter and I want to know whether my employer, the fire department, is complying with the city fire code, I pull that book and I might find that the city fire code is the NFPA fire code from 2018. What is that? So somehow I need to try to track that down to find out whether my personal protective gear is compliant with local law. That's what I'm interested in. I'm interested in legal compliance, and so I need the law in order to assess legal compliance. You must show a good example because if you're a firefighter, you're not necessarily interested in the legal requirement. You want the best possible equipment, and you want to know if that legal requirement has been superseded, don't you? Well, I might be interested in both. I might have different purposes, right? I may fundamentally be interested in whether my employer is following the law. If I'm a reporter, you have an amicus brief from the reporters committee here. If I'm a journalist, I may want to know whether a big construction project going in downtown is following the law. I may be less interested in whether they're complying with latest recommendations kind of by industry professionals. I may want to know whether they're following the law. If I'm a tenant and I think the law should be changed because it's not sufficiently protective of building safety, I need to know what the law is, and I may want to ask my city council member to amend it and change it.  I think the use that's being put by a consumer is evidence of or informs how you assess. It's a reasonable person standard. How would a reasonable person assess the purpose to which this is being put? If you go to the UpCode's website, you will see the list of... And UpCode's does, because UpCode's looks at what is incorporated, and it pulls that text, and it makes it available to everyone. Yeah, I didn't mean to suggest that. I think they're two sides of the same coin, Judge Smith, because UpCode's is offering this material as law because it is law. These are binding requirements of the city of Philadelphia. It's putting it up on its website as law, not as an industry standard. And then conversely, people can go then find it there as law, because that's the purpose of it. If you click on ASTM A252 on the UpCode's website, you're not brought to the text of that standard. You're brought to the list of jurisdictions that have adopted it with or without amendments, and then you click on the jurisdiction, and then you get the adoption by that jurisdiction. Again, if it's been amended, then the amendments are shown there, because UpCode's is wanting to provide what the law is of these jurisdictions. I'm happy to keep talking about Factor 1, but I'm mindful of time. Why don't you go to Factor 2? I'll go to Factor 2, because here, again, I'm going to call the court's attention to the D.C. Circuit's decision, which involves ASTM also. And this involves the kind of the fact fiction spectrum or the utilitarian artistic spectrum. And what the law says is that if you're at the end, the kind of utilitarian or fact end of that spectrum, then fair use is more likely to be found. And we are at the extreme end. I know the court has probably looked at some of these standards in the joint appendix. We are at the extreme utilitarian end of the spectrum. And what the D.C. Circuit said was, of course, to the extent that these standards have been incorporated into law, we've kind of jumped the rails and we're even beyond copyrightability. So I think that Factor 2 is actually quite important. Mr. Fee suggests, oh, you can kind of overlook Factor 2. It's not as important. But the latest from the Supreme Court in Google versus Oracle is that there is no hierarchy or priority of these factors. They're all important. And depending on the facts or circumstances of a case, you might look at one over the other. And in Google versus Oracle, the court actually started with Factor 2. That was a critical part of the Supreme Court's analysis there. And I think it's critical here as well. Factor 3, the amount and substantiality of the copying. This, I think we're all kind of in agreement, this ties to the transformative purpose. Because we have the transformative purpose of posting the law and only the law, the only way to post the law is to post its text and all of it. So when the entire International Building Code is incorporated by reference and made binding obligation by the city of Philadelphia, then we post that entire code. And when that code in turn incorporates ASTM standards in their entirety, we post them in their entirety. That's the only way to convey the law to the reader. The fourth factor, the district court concluded that it didn't really point in one direction or another. We think that that is at the very least correct. We think it actually favors fair use here. I want to go to the substitution point. How does it favor fair use to market harm? Yeah, because under Factor 4 you look at market harm, but there's a balancing. You also look at public benefit. This is Google versus Oracle says this. So we think the public benefit here is quite significant because this is, again, the only place you can go. Do you recognize a market harm? We recognize a minimal market harm. Page 48 of our brief is the best place to go for this. Some of these numbers are under seal, so I don't want to go into the specifics. But this goes back to what we were talking about, about the versions, right? So when ASTM issues a new version of one of these standards, which they do every few years, we don't post that new standard unless and until it's adopted by some jurisdiction, and there's a lag there. That takes quite a while. When you look at the sales data for these standards, the sales of the old superseded standards falls to the floor. It stands to reason, because if you're a building professional looking for a standard, as a standard you want the latest standard. You don't want the old superseded one. So to the extent that there's competition with ASTM standards, it's with those old superseded ones, because nine of the ten of the works at issue here have been superseded, and those sales are minuscule. You can look at the sealed numbers for yourselves. To the extent that that's the only kind of cognizable harm, and it's minimal, to the extent that they're saying we're harmed because when people want the law, they should have to come pay us for the law because we have monopoly control over the words of the law, that's not a cognizable harm under Factor 4. So you look at that kind of non-cognizable harm with respect to competition for the law, incredibly minuscule supposed harm with respect to the superseded standards, and you compare that to the quite significant public benefit of having a place where you can go and look at the law that governs your community, have it all be there for free in one place, that benefit, we think, offsets any minimal harm. At the very least, it's a wash, and then the first three factors would all point you to finding a fair use. Judge Smith, you asked about how to think about these factors. They're not prongs. They're not a checklist. They're not even exclusive. The statute says include, you know, including these factors. There might be others. I think the courts often take a step back and look at what's the purpose of copyright and how does this connect to the kind of free expression purposes of copyright, and the fair use defense ties into this. And we think when you're talking about speaking the law or publishing the law, there are considerable constitutional values at issue, First Amendment and due process and democratic deliberation that are all kind of part of the mix because those are values that inform our copyright law. In this case? In this case, we don't think so because we think the district court was correct, that the first three factors all weigh heavily in favor of fair use, and at worst, the fourth factor is neutral, so that points you in one direction. And the D.C. Circuit held the same in the ASTM case. It had the analysis. The district court decision here really quite closely tracks the D.C. Circuit's analysis where it found that the first three factors strongly supported fair use and the fourth was something of a wash is what the D.C. Circuit said. And if you follow that same roadmap, I think you find you reach a conclusion of fair use. We do have alternative grounds. I know I'm well over time. I will defer to the court on whether you want to hear from me on government edicts. I know my friend on the other side did speak about it briefly. I asked about it. I'm not sure it plays as big a role. I think your opponent may have been right about that, but I'll defer to my colleagues. Do you want to hear about government edicts? I'm happy to give you just four or five sentences. We'll listen to four or five sentences. Four or five sentences. Okay. So what was at issue in Georgia was not binding law. It was the non-binding annotations. And the court said with respect to non-binding annotations, what mattered was authorship. Were these people who had the authority of the state to make law, was it their speech even though it was non-binding? There was no question in Georgia that the law itself could not be copyrighted. The court said that at page 266. Of course, including final legislation cannot be copyrighted. That's a foundational principle going back to the early 19th century, that actual rules of conduct enacted into law cannot be copyrighted. Thank you very much. Thank you. Welcome back. Thank you, Your Honor. I just want to touch on a couple of points, and of course I'd be happy to field any other questions the panel might have. A couple of times during the last presentation, we heard suggestions that these standards are out of date and nobody cares about them anymore. I just want to make sure we are all clear about what the record shows for this case. It is true in the ASTM case that the D.C. Circuit addressed that the D.C. Circuit commented on the fact that the federal government, because those are all federally incorporated works, was not the quickest at updating its regulations for reasons that you can sort of understand because of the regulatory process. So that case dealt with standards that were lots of times 20, sometimes even 50 years old. And in that particular circumstance, the court said like, okay, maybe the market harm isn't so bad if you're dealing with a 50-year-old standard. But it's important to look at what the record is in this case. In this case, the way that they are saying that these works are the law or are legally binding is because Philadelphia adopted the 2018 International Building Code. And if you look at the record at JA 1299 to 1301, that is where these 10 standards are listed in the International Building Code. And it lists the year for each of those works. And if you look at them, none of them are 50 years old. None of them are 20 years old. I don't think any of them are 10 years old. A lot of them are less than five years old. And why is that important? Because ASTM updates its standards every five years. So when the International Building Code adopts these ASTM standards, they are, in many instances, the very up-to-date standard. And if they're not the very up-to-date, they're very close. So this is different than what we were dealing with in the ASTM case when we were dealing with some older standards, admittedly. But would you agree that their use is transformative? It's kind of counterintuitive what transformative means in this sense. But given the objective way that that is looked at, would you agree that their use is transformative? No, I think it's literally impossible to reach that conclusion. Even given the bottom-of-the-wave case? Warhol tells us two things. Well, even given the Baltimore Ravens case? Oh, yeah. Well, first of all, the Baltimore Ravens case was before Warhol. It didn't have the benefit of that. And it's not the Supreme Court, obviously. The Warhol is very different. But Warhol tells us two things that were basically absolutes. One was that if you want to be a transformative work, the court says you must. You must do more than what is required to be a derivative work. There is no alteration, commentary, criticism, change at all to any of the ASTM standards that are posted by the defendant here. And, you know, I heard my friend talk about, you know, if there were amendments to portions of works that are incorporated by reference, Upcodes would try to work that into what they post on our website. Well, that's an interesting story. It has nothing to do with the facts in this case. None of the works were amended by any of the jurisdictions that have been cited by Upcodes as a basis for posting these standards. So it's literally making no changes whatsoever to our standards. Oh, and I said two things that Warhol told us. The other thing that Warhol told us is that we should be focused on substitution. Even the district court found that we were effective substitutes. They were effective substitutes for our work. So there's two big takeaways about what is transformative in Warhol. Both of them indisputably show that there is not a transformation in this particular circumstance. I do want to just touch briefly. I did also hear my friend say that Upcodes' only interest is to convey the law. With all due respect, give me a break. That is not what this is about. They're trying to build a multibillion-dollar company with the Silicon Valley backers. That's what this is about. If they were worried about access, I said this before, they would put the stuff on their website for free without requiring a login. But they don't. They require a login. They want to get your personal information and upsell you their services. There's also testimony in the record that they wanted to put it behind a password-protected wall because they were worried about AI tools getting access to the codes through their copies, and they don't want people going to the AI sources for the codes. They want them to go to them. So the idea that this was done out of the goodness of Upcodes' heart, frankly, just cannot be believed. I did hear that their purpose in putting these things online is completely different from what ASTM is doing because they're trying to show everybody what the law is. I guess I just want to remind the Court again that ASTM literally has a publication that it sells entitled ASTM Standards in Building Codes. That is a publication that they sell that can contain these works. So one of the purposes of ASTM's standards in this issue is to be in a publication that provides everybody access to standards in building codes. I think both the District Court and my friend sort of try to suggest that there is only one purpose for a work. That's not true. Even in Warhol, the Court said you could use the photograph to illustrate a magazine, or you could give it to Warhol or another artist to make a derivative work from there. You have to consider all the potential purposes that are reasonable to foresee, and you don't have to speculate about whether or not ASTM is trying to make these building codes available, or I'm sorry, trying to make their standards as referenced in the building codes available. They literally sell a book that has that title. So unless Your Honors have any other questions, that's all I have. Thank you very much. Thank you so much, Your Honors. The entire concept of the Ravens is a copyright violation. Thank you very much for your brief scenario, Mr. Counselor.